Filed 2/27/15  P. v. Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARCELO ANTONIO LOPEZ, JR., <br><br> Defendant and Appellant. | F067244 <br><br> (Super. Ct. No. VCF266987) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Marcelo Antonio Lopez, Jr. guilty of two counts of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)), one count of shooting at an occupied vehicle (§ 246), and two counts of assault with a firearm (§ 245, subd. (a)(2)). The jury also found true special allegations that he committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).

On appeal, Lopez contends there was insufficient evidence to support the gang enhancement finding. He also contends he received ineffective assistance of counsel because defense counsel failed to object to two aspects of the gang expert's testimony.

In addition, the parties agree that incorrect terms were imposed for counts 4 and 5, the two counts of assault with a firearm. We will strike the 20-year firearm enhancements and reduce the gang enhancements from 10 years to five years for counts 4 and 5. We affirm the judgment in all other respects.

## FACTS AND PROCEDURAL HISTORY

In the evening of April 23, 2012, Christian D. and his friend Juan D. drove to a gas station in Pixley to buy a blunt wrap.[2] They were in Christian's black car and Christian was driving. At the gas station, they parked at a gas pump, went into the store, made their purchase, and returned to their car. As Christian and Juan were leaving the gas station, Juan saw someone throw gang signs. Specifically, he noticed a vehicle pull up to the front of the store and a person in the backseat "threw up the four." Christian left the gas station and then made a U-turn to go back to the gas station. After Christian made the U-turn, Juan heard gunshots, and he ducked and covered. At the same time, Christian

---

[1]  Subsequent statutory references are to the Penal Code unless otherwise specified.

[2]  Blunt wraps were described as "cigarette wrapping" and were also referred to as "papers to roll marijuana cigarettes."

saw someone run toward his car and start shooting. He pushed the gas pedal and drove away. Neither Christian nor Juan was injured.

Christian and Juan did not go to the police after the shooting. Instead, they went to a friend's house. They looked at Christian's car and saw five bullet holes. Christian told his brother about the shooting, and his brother reported the shooting to the police.

Tulare County Sheriff's Deputy Charles Rooney responded to the report of a shooting. He met Christian and inspected his car. There was a bullet hole in the lower right bumper of the vehicle, two holes on the right rear passenger door, and a hole in the lower right rear of the vehicle. One projectile was found in the trunk. Rooney believed the projectile was from a .25-caliber firearm.

Rooney then went to the Pixley gas station where the shooting occurred. Five .25-caliber shell casings were found at the scene. One shell casing was in the gas station parking lot, and four more casings were found on the street on Main Street. The gas station had a video surveillance system, and Rooney was able to view surveillance video of the shooting and events preceding the shooting. He observed Juan and Christian in Christian's black car and a green two-door Chevy truck entering the gas station. Rooney recognized the front passenger of the green truck as Roy Pulido, with whom Rooney had previous contact. It appeared that Pulido made "hand gestures or mov[ed] his arms." Pulido could be seen exiting the truck and going in the store, and he remained in the store during the shooting. Sergeant Larry Camacho also watched the surveillance video. He recognized Lopez and Pulido from prior contacts. The video showed that after Pulido got out of the truck, Lopez exited the truck from behind the passenger seat; Lopez then began chasing Christian's car and fired at it.

The next day, sheriff's deputies searched Lopez's residence in Earlimart. They located two live rounds of .25-caliber ammunition in a sports bag that also contained Lopez's clothing. No firearm or clip was found.

3.

Detective Victor Bonilla conducted a recorded interview with Lopez. During the interview, Lopez admitted he associated with Northerners but denied he was an active gang member. At first, Lopez told Bonilla he did not shoot anyone and he did not have a gun. He also denied that he had been in Pixley the previous day. Later, when confronted with evidence, Lopez admitted that he committed the shooting. At some point, Lopez said it seemed like the passenger in the black car had a gun.

In December 2012, the Tulare County District Attorney filed a five-count information against Lopez, charging him with attempted murder of Christian D. (§§ 664, 187, subd. (a); count 1) attempted murder of Juan D. (§§ 664, 187, subd. (a); count 2), shooting at an occupied vehicle (§ 246; count 3), and assault with a firearm on Christian D. and Juan D. (§ 245, subd. (a)(2); counts 4 and 5 respectively). As to counts 1 and 2, the district attorney alleged that Lopez attempted murder with premeditation within the meaning of section 664, subdivision (a). For all counts, it was alleged that Lopez committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that a principal to the crimes personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).

A jury trial began on March 4, 2013. Christian and Juan testified about the shooting, and both testified there were no weapons in Christian's car. Juan testified that he was not a gang member, but his friends were Southerners. He was in high school at the time of trial, and there were no Northerners at his high school. His classmates who were gang members were all Southerners.

Christian admitted that he was a Southern gang member. He testified that after he and Juan returned to his car at the gas station, Juan told him, "Look, here comes some persons in red," which Christian understood to mean Juan saw rival gang members.[3] Christian recognized Pulido and knew him to be a Northerner. Christian admitted that he

_____
**3** Christian testified through an interpreter.

4.

returned to the gas station to fight "hand to hand." He testified, "[T]hey threw the four and I thought if they were men … they would fight with us, hand-to-hand fight, but they pulled out the gun." He thought throwing the four was a sign of disrespect. In cross-examination, Christian agreed that he was uncooperative with the police and that, in one statement to the police, he stated that Pulido shot at his car.

Surveillance video from the gas station and a recording of Lopez's interview were played for the jury.

Pulido, testifying under a grant of use immunity, agreed that on April 23, 2012, he went to a gas station in Pixley in a green truck. However, he denied that Lopez, whom he called "Panda," went to the store with him. Shown still photographs from the video surveillance system, Pulido identified himself as the front seat passenger, but he could not identify the other person who got out of the green truck.

Rooney testified, among other things, that he interviewed Pulido the day after the shooting. Pulido told Rooney that on the day of the shooting, his friends, including Lopez, pulled up to his house in a green Chevy S-10 and asked him if he wanted to "burn one," meaning smoke a marijuana joint. They drove straight to the gas station, with Lopez sitting in the back seat of the truck. Pulido said that he and Lopez were the only ones to exit the truck at the gas station.

Crystal Darington, a detective in the South County Gang Suppression Unit of the Tulare County Sheriff's Department, testified as a gang expert. She was familiar with the various street gangs of Tulare County. Darington testified that Norteño or Northern gang members are generally located in Northern California and Sureño or Southern gang members are in Southern California. Southerners and Northerners are rivals. In the past, the dividing line between the gangs was Bakersfield, but Southerners have been moving north. At the time of trial, Pixley was Southern territory and Earlimart was Northern territory, and there were at least 2,000 Northerners in Tulare County.

5.

Darington explained that Northerners are overseen by the prison gang Nuestra Familia. She testified that the gang has a hierarchy similar to organization of the military. Northerners identify with the color red, the number 14, and the letter N. Hand signs are also symbols, and "throwing a four" shows allegiance to the gang. Darington testified that throwing gang signs to a rival would be as sign of disrespect or a challenge inviting some sort of confrontation. She further testified that the primary activity of Northerners is "[c]ommitting crimes," including the crimes "[r]obbery, burglary, assaults, witness intimidation, just to name a few."

Darington described two predicate offenses committed by Northern gang members. In 2010, Jesus Minhares was upset with his girlfriend. He forced her in a car and had his sister drive her to a location in Earlimart. Then Minhares ordered his cousin to fight his girlfriend. As a result of this incident, Minhares was convicted of assault with a deadly weapon. Darington opined that Minhares was a Northern gang member based on the facts that he had admitted to being a Northerner, specifically with the subset Infamous Youngstas, he associated with other gang members, and he wore the color red.

Darington explained that the Infamous Youngstas was a group of young men out of the Earlimart area. The group started in mid-2000 as the "Small Town Pimps" and renamed itself Infamous Youngstas in 2007. Regarding the relationship between the Infamous Youngstas and the Northerners, Darington testified:

> "Nuestra Familia … oversees all Northerners .… Then there's Nortenos which typically have put in work and they are a member of that gang, whether it's a criminal street gang or it's just under the umbrella of the Nortenos. They [Infamous Youngstas] fit under the umbrella because they are the criminal street gang in Earlimart. They're all Northerners. They all identify with the color red, and they all have an alliance with the Nuestra Familia."

In 2009, Daniel Nunez and other Northern gang members from Earlimart stopped in Pixley to get gas. Nunez recognized someone at the gas station as a Southern gang member who had made fun of him when he was a child. Nunez told his friend he needed

backup, and then he and Alex Garcia yelled gang slurs and assaulted the victim. Darington opined that Nunez was a member of Infamous Youngstas and was a Northern gang member at the time of the offense. He was convicted of assault with a deadly weapon with a gang enhancement.

Darington was familiar with Lopez from personal contacts. In addition, she talked to other law enforcement officers and reviewed law enforcement reports on Lopez. She knew his gang moniker was "Panda Locs." In July 2008, Lopez had contact with law enforcement when he was found with another Northern gang member. In March 2009, Lopez was caught on video surveillance with another gang member, Eric Macias, tagging property at the Earlimart middle school. Lopez tagged "Panda" and some gang slurs. He was about 15 years old at the time. Also in 2009, officers contacted Lopez while he was in a vehicle in Earlimart with four other Northern gang members, including Juan Perez and Simian Cruz. The officers stopped the vehicle because it matched the description of the suspect vehicle in a nearby gang-related drive-by shooting. Darington testified that Perez was a shot caller for the Infamous Youngstas. She was also familiar with Pulido, and she opined that Pulido, Macias, and Cruz were all validated gang members in the subset Infamous Youngstas.

In June 2010, Lopez's fingerprints were found at the location of a residential burglary in the Earlimart area. In January 2012, Lopez was involved in a stolen vehicle case in Visalia. This incident involved other gang associates, including Nunez. In June 2010, Lopez admitted to a detective that he was a member of Infamous Youngstas and he was wearing gang attire. In July 2010, Lopez denied that he was involved with Infamous Youngstas, but claimed to be a Northerner. He also denied using the moniker Panda Locs.[4] In February 2012, a detective contacted Lopez. He was wearing a red belt with

---

**4** Darington testified that it was a trend in Earlimart to minimize gang membership when dealing with law enforcement. She explained that gang enhancements were being imposed against members of Infamous Youngstas, and they were trying to avoid gang enhancements.

the letter N on the buckle and was with another known gang associate. In October 2008, Lopez was in custody at the juvenile detention facility and an officer found graffiti carved in his cell, including "XIV," "Norte," and "SK." Darington explained that "scrap" is a derogatory term for Southern gang members used by Northerners and "SK" stands for "scrap killer." In June 2008, Lopez was arrested for vandalism. At that time, he admitted to a probation officer that he was a Northern gang member with the moniker Panda. In October 2008, Lopez was booked into the juvenile detention facility. He admitted to being a gang member with the Infamous Youngstas, and he was wearing a T-shirt that read "IY" and "Fuck a scrap." He was found wearing the T-shirt in Visalia. Darington testified that the T-shirt communicated that Lopez was an Infamous Youngsta and invited confrontation with Southerners. In August 2009, Lopez was contacted by his probation officer at a known gang hangout.

In October 2010, Lopez was booked into the juvenile detention facility after he was arrested for driving a stolen vehicle and evading arrest. At booking, he admitted to being an active Northern gang member with the Infamous Youngstas. Darington explained that every time a person is arrested and placed in custody in Tulare County, he or she is required to fill out an inmate classification questionnaire that asks whether the person associates with prison or street gangs. On two occasions, Lopez answered "yes" to this question and identified as "North." He also listed "South" as his enemies.

Darington also reviewed photographs and papers found in Lopez's possession. She read from a piece of paper, "Now I'm claiming IY and I'll put a 9 to fucking dome," which she stated meant Lopez was "claiming to be Infamous Youngstas and he would put a nine millimeter bullet in your head." Darington read from another page: "These muthafuckas trying to be like me Panda Locs with a capital P. The homies use[d] to be the S.T.P. Now you bitch ass scraps get on your knees. Like me Big Panda Locs with a capital P, all up in your face and let the trigger squeeze 4, you lil squeeze tryin to be like me." "S.T.P." referred to the previous name of the subset, Small Town Pimps.

8.

Darington testified about the writing: "It uses the derogatory term 'scraps,' which shows in my opinion he's a Northerner speaking derogator[il]y of Southern gang members; again identifying himself as Panda Locs and that he has a propensity [for] violence towards these people." Photographs of Lopez with other gang associates were admitted into evidence.

Darington testified that Lopez had a tattoo of "TC," which represents Tulare County. She explained that Northern gang members pride themselves on their turf, and a tattoo of "TC" would say to rival gang members that Tulare County is Northern territory. Darington opined that Lopez was a gang member, specifically of the subset Infamous Youngstas. Her opinion was based on his admission in custody that he was a Northern gang member, his association with gang members, his involvement in gang-related crimes, his tattoo, and the fact that he had been found wearing gang attire and in possession of gang writings and photographs.

The prosecutor presented Darington with the following hypothetical situation: In the Pixley area—an area known to have a small number of Northerners and a large number of Southerners—a black vehicle enters a gas station at around 7:00 p.m. The driver and passenger buy blunt wraps and return to their vehicle; the driver is a Southerner. A green truck with two to four individuals enters the gas station. The passenger of the black car tells the driver that someone from the green truck threw a four at them. The black car starts to leave the gas station, but the driver feels disrespected and decides to go back. Two individuals from the green truck—referred to by the prosecutor as "shooter" and "friend"—get out of the truck. Friend goes into the gas station store, and shooter leans into the truck. Shooter walks around the truck and then runs toward the black car. Shooter starts to fire at the black car, firing five shots and chasing the car. Five shots hit the black car. Shooter has numerous gang-related law enforcement contacts and has identified himself as a Northerner when booked into custody. Writings found in shooter's possession describe shooting scraps.

9.

Darington gave her opinion that the acts of the shooter in the hypothetical would be for the benefit of a criminal street gang. She noted that the hypothetical involves rival gangs members, a firearm is used, and the incident occurs during the day, so it would instill fear within the community. She explained, "[I]t promotes the gang, because it shows their propensity for violence, and they won't back down." She opined that the shooter in the hypothetical would gain respect within his gang. Darington further testified that she would expect the friend in the hypothetical to lie about the incident because he would not want to be a snitch or rat.

In cross-examination, Darington agreed that Northerners and Southerners may go to the same school, play on the same football team, sit in the same classrooms, and associate with each other in some ways. She agreed that if a young person had an uncle who was a Southern gang member, he might want to be housed with Southerners if he were arrested.

The defense called Lopez's mother, Rosa Lopez, as a witness. In 1997, the family moved to Southern California. Lopez's grandmother, who lived in Earlimart, was diagnosed with lung cancer, and Lopez was sent to live with her so she would have company. Rosa gave Lopez the nickname Panda because he was chubby and he liked to wear white and black. She testified that Lopez never indicated to her that he was a gang member. He had artistic leanings and liked to draw. Rosa further testified that she had never known Lopez to have a propensity for violence.

Lopez testified on his own behalf. He moved to live with his grandmother in December 2011. Before that, he was in Camp Miniwa, which was a military camp. He was at the camp because he stole a car in 2011. Lopez testified that he was aware of people in Earlimart who were gang members, but he was not a gang member. He never considered himself a gang member. Macias was his friend from Delano High School.

Lopez admitted that he committed the shooting. On April 23, 2012, he was with three guys in a green truck. He knew Pulido, but he did not know the driver of the truck

10.

or the other passenger. They went to the gas station in Pixley to get a cigarette wrap. When they pulled into the gas station, Lopez heard the driver say something to the back passenger, but he did not hear what was said. He heard the back passenger say, "They're coming back." The back passenger told Lopez there was a gun, and Lopez grabbed it from the floor of the truck. Asked why he was getting a gun, Lopez first responded, "I don't know," and then "Well, he said they were coming back." Lopez went toward the black car. Defense counsel asked why he was going toward the car. Lopez replied, "I don't know. I just thought I was protecting myself." Asked what he was protecting himself from, Lopez said, "Well, I don't know what their intentions were." He admitted that he ran toward the car and was shooting. He testified that he was "[t]rying to scare them away." Asked what made him want to scare them, Lopez responded, "I don't know. I felt like my life was threatened or something by them coming back." He thought he saw a gun. Lopez testified, "When I was [standing] in back of the truck, I thought they had it pointed." He further testified that it was not his intention to kill anybody when he fired the gun. Lopez did not know what happened to the gun he used; he left it in the green truck.

Lopez denied that he had ever seen the ammunition found in his bag during the search of his house. He testified that he did not know the ammunition was in his bag. He got the tattoo of "TC" when he was 13 years old. He got a tattoo of his mother's name the same day.

The jury reached a verdict on March 11, 2013. Lopez was found guilty of all five counts. The jury found not true the special allegation that Lopez committed attempted murder with deliberation and premeditation, but found true the remaining gang and firearm allegations.

The sentencing hearing took place on May 7, 2013. For count 3, the trial court ordered an indeterminate term of 15 years to life pursuant to section 186.22, subdivision (b)(4)(B), plus an additional consecutive term of 20 years pursuant to

section 12022.53, subdivision (c). For counts 1 and 2, the court imposed two identical terms consisting of a middle term of seven years plus a consecutive term of 20 years pursuant to section 12022.53, subdivision (c), and an additional consecutive term of 10 years pursuant to section 186.22, subdivision (b)(1)(C). The terms for counts 1 and 2 were stayed pursuant to section 654. For counts 4 and 5, the court imposed identical terms consisting of a middle term of three years plus an additional consecutive term of 20 years pursuant to section 12022.53, subdivision (c), and an additional consecutive term of 10 years pursuant to section 186.22, subdivision (b)(1)(C). Again, the terms were stayed pursuant to section 654.

## *DISCUSSION*

### I. *Sufficiency of evidence on primary activities*

The jury found true the special allegation that Lopez committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. As a consequence, Lopez was sentenced to an indeterminate term of 15 years to life for his conviction for shooting at an occupied vehicle. (§ 186.22, subd. (b)(4)(B).) Lopez also received an additional determinate term of 20 years for the firearm enhancement.)

A "'criminal street gang'" is defined in section 186.22, subdivision (f), as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in … subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.) The enumerated criminal acts of subdivision (e) include assault with a deadly weapon, robbery, burglary, witness intimidation, grand theft of a vehicle, and shooting at an occupied motor vehicle. (§ 186.22, subd. (e)(1), (2), (5), (8), (9), (11).)

12.

On appeal, Lopez contends there was insufficient evidence of the primary activities element to support the gang enhancement finding. He points out that the prosecutor asked Darington about the primary activities of Northerners but he did not specifically ask her about the primary activities of the subset Infamous Youngstas. Lopez argues the prosecution failed to prove that the primary activities of the Northerners could be characterized as the primary activities of the Infamous Youngstas and, therefore, it failed to prove the gang enhancement allegation. We reject the premise of this argument. We conclude there was sufficient evidence to support the gang enhancement because there was sufficient evidence for a reasonable jury to determine that the Northerners are a criminal street gang and that Lopez committed the offenses for the benefit of the Northerners with the requisite specific intent.

In deciding a challenge to the sufficiency of the evidence, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Ibid*.)

Here, Darington was familiar with the criminal street gangs of Tulare County and qualified as gang expert. She testified that the Northerners or Norteños are organized in a military-type hierarchy and identify with the color red, the number 14, and the letter N. The gang's rivals are Southerners or Sureños. The primary activities of Northerners include robbery, burglary, assaults, and witness intimidation. She further testified about assault crimes committed by Minhares and Nunez, both of whom Darington identified as Northerners. Darington's testimony was sufficient to support a finding that the group known as Northerners is a criminal street gang within the meaning of section 186.22. Indeed, Lopez does not claim that the gang expert's testimony was insufficient to support the primary activities element as to the Northerners. The prosecution was not required to

13.

separately prove that the Infamous Youngstas also qualify as a criminal street gang. (See *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1356–1357 [rejecting argument that prosecution was required to prove which particular subset of Norteños was involved in charged crimes to establish gang enhancement].)

The evidence was also sufficient to support a finding that Lopez committed the offenses for the benefit of the Northerners with the requisite specific intent. The evidence showed Lopez was in the green truck with at least one other Northern gang member, the victims in the black car were a rival Southern gang member and an associate of Southerners, someone in the green truck directed a Northern gang sign at the victims before the shooting occurred, and Lopez chased the black car as he shot at it. In addition, Darington testified at some length about Lopez's contacts with law enforcement, his gang moniker, his identification with Northern symbols through clothing, graffiti and writings, and his association with other known Northern gang members. In June 2008, Lopez admitted to a probation officer that he was a Northern gang member with the moniker Panda. In July 2010, Darington contacted Lopez, and he claimed to be a Northerner.[5] In February 2012, Lopez was found wearing a red belt with the letter N on the buckle. Lopez demonstrated his antipathy to rival Southerners by wearing a T-shirt that said, "Fuck a scrap." His writings also showed he was "a Northerner speaking derogator[il]y of Southern gang members." Discussing the hypothetical presented by the prosecutor, Darington gave her opinion that the shooting would benefit a criminal street gang:

---

[5] Lopez argues that evidence showing he self-identified as a Northerner on juvenile custody forms cannot be considered proof that he was acting on behalf of the Northerners because a person who merely has a relative who is a Northerner might request to be housed with Northerners rather than Southerners. Lopez's argument goes to the weight of the inmate classification evidence, however, not its relevance. Further, this argument ignores the evidence that Lopez apparently identified himself as a Northerner to law enforcement on occasions unrelated to inmate classification. It also ignores all of the other evidence tending to show Lopez was a Northerner (or at least felt an allegiance to Northerners) such as his writings, graffiti, attire, and history of associating with other Northern gang members.

14.

"Passersby could have seen what was happening, which instills fear within the community.  Again, it shows that this specific gang is a force to be reckoned with.  They'll not tolerate the disrespect and they'll handle business if you disrespect them or their cause.  Furthermore, it promotes the gang, because it shows their propensity for violence, and they won't back down."  The evidence of the circumstances of the shooting together with Darington's testimony was sufficient for the jury to find the gang enhancement allegation true.  (See, e.g., *People v. Livingston* (2012) 53 Cal.4th 1145, 1170–1171 [evidence that the defendant, a gang member, was with fellow gang members when he fired shots at a rival gang member was sufficient evidence to support gang enhancement allegation; "a driveby shooting by a gang member of a rival gang member is a prototypical example of a gang-related crime"].)

For his argument, Lopez relies on *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*).  In that case, the defendant was convicted of murder with a gang-activity special circumstance and was separately convicted of active participation in a criminal street gang.  (*Id*. at p. 985.)  At trial, prosecution witness Dilbeck testified that the Peckerwoods were a criminal street gang and that smaller groups such as the Small Town Peckerwoods (STP) were all factions of the Peckerwood organization.  (*Id*. at p. 988.)  On appeal, the defendant did not dispute that he was an active participant of STP, but he argued there was no evidence that he was an active participant in any other group and there was insufficient evidence of a connection between members of STP and the larger criminal street gang known as the Peckerwoods.  (*Id*. at p. 987.)  This court agreed with the defendant.  We observed that Dilbeck's opinion that smaller groups such as STP were factions of the Peckerwoods "appear[ed] to have been based on commonality of name and ideology, rather than concerted activity or organizational structure."  (*Id*. at p. 988.)  We explained, "In our view, something more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang."  (*Ibid*.)

15.

Consequently, we held "only [STP] and not some larger Peckerwood group, may be considered in assessing [the defendant's] claims of evidentiary insufficiency." (*Id.* at p. 989.)

*Williams* does not assist Lopez. In *Williams*, the defendant was convicted of active participation in a criminal street gang, but there was insufficient evidence showing the defendant was an active participant in the larger criminal street gang known as the Peckerwoods. In contrast, as we have explained, there was sufficient evidence in this case to support the jury's findings that the Northerners are a criminal street gang and that Lopez committed the offenses for the benefit of Northerners. Thus, there was sufficient evidence to support the gang enhancement.[6]

## II.     *Claims of ineffective assistance of counsel*

Lopez claims he received ineffective assistance of counsel when his attorney failed to object to the gang expert's testimony on two occasions. Specifically, defense counsel allowed the gang expert to testify without objection on (1) a prior gang-related shooting and (2) Lopez's asserted propensity for violence toward rival Southerners as demonstrated by his writings. We begin with a brief discussion of the law governing claims of ineffective assistance of counsel and then consider the two instances of alleged deficient representation.

### A.     *Applicable law and standard of review*

"To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish [1] that counsel's performance fell below an objective standard of reasonableness and [2] that, to a reasonable probability, defendant would have

---

[6]     We note that, unlike the defendant in *Williams*, Lopez was not convicted of being an active participant in a criminal street gang under section 186.22, subdivision (a). The gang enhancement of section 186.22, subdivision (b), does not require proof of participation in a gang. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130, fn. 5.) Nonetheless, we observe that, also unlike *Williams*, there *was* sufficient evidence in this case that Lopez was a member of the larger criminal organization, the Northerners.

obtained a more favorable result absent counsel's shortcomings." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1068.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*Id.* at pp. 1068–1069.)

"Our review is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective at the time. [Citation.] A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) "In general, reviewing courts defer to trial counsel's tactical decisions in assessing a claim of ineffective assistance, and the burden rests on the defendant to show that counsel's conduct falls outside the wide range of competent representation. [Citations.] In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

### B.     *Failing to object to testimony on prior gang shooting*

Darington reviewed law enforcement reports and spoke to other officers about Lopez. The prosecutor stated that he intended to ask Darington about, in chronological order, "[e]ach piece of information that [Darington] discovered in [her] research of … Lopez that [she believed was] relevant in [her] opinion whether or not … Lopez [was] a gang member." Darington described an incident in December 2009 during which officers stopped a vehicle in Earlimart and found Lopez with four other Northern gang members. The prosecutor asked why this incident was relevant, and Darington responded, "[G]ang members associate with other gang members. They were found in the vicinity of a

gang-related-type shooting, [a] drive-by shooting. The vehicle they were located in matched the description of the suspect vehicle."

"Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) "'"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citations.]" (*Id.* at p. 1168.)

Here, the prosecution's theory was that Lopez chased and shot at Christian's car because he intended to kill rival gang members. In addition, to establish the gang enhancement allegation, the prosecution was required to prove that Lopez committed the offenses "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).) Darington's testimony about the December 2009 vehicle stop showed Lopez's prior involvement with gang members and was, therefore, relevant both to establish the motive for the charged offenses and to support the gang enhancement allegation.[7]

Lopez does not dispute that Darington's testimony was relevant. He argues only that defense counsel should have raised an objection under Evidence Code section 352 on the grounds that the testimony was more prejudicial than probative and was cumulative. As we have mentioned, however, "[t]he decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1335.) Here, the

---

[7]     In light of Lopez's subsequent testimony that he was not a gang member and did not consider himself a gang member, this gang evidence was also relevant to his credibility. (See *People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1167.)

record does not disclose why defense counsel did not object to Darington's testimony about the December 2009 vehicle stop because he was not asked to explain himself. Consequently, we must reject Lopez's claim "unless there simply could be no satisfactory explanation" for his attorney's conduct. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1069.) We have reviewed the trial transcript and observe that, in a 10-page span of transcript within which Darington's testimony appears, defense counsel raised five objections to testimony and the admission of evidence and was overruled on each occasion. It is possible defense counsel decided not to object to this particular testimony because he believed the objection was likely to be overruled. Alternatively, defense counsel may have determined that interposing too many objections risked alienating the jury, or he may have thought that objecting risked highlighting the evidence to the jury. Since we can conceive of possible satisfactory explanations for defense counsel's failure to object to Darington's testimony, we cannot say his performance fell below an objective standard of reasonableness.

Further, even assuming his attorney's conduct was deficient, Lopez has not shown prejudice. Had defense counsel objected under Evidence Code section 352 to Darington's testimony about the December 2009 vehicle stop, it would have been within the trial court's discretion to overrule the objection and allow the testimony. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["'admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason'"].) In order to find prejudice, we would have to conclude that it was reasonably probable that the trial court would have sustained an objection if it had been raised. On the record before us, we cannot do so.

Finally, as the Attorney General argues, any risk of potential prejudice from Darington's testimony was mitigated by the jury instructions. The trial court instructed the jury as follows:

"You may consider evidence of gang activity only [for] the limited purpose of deciding, one, [Lopez] acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charge or[, two,] [Lopez] had a motive to commit the crimes charged. You may not consider this evidence for any other purpose. You may not conclude from this evidence that [Lopez] is a person of bad character or that he has a disposition to commit crime."

Lopez argues that the jury, having heard about the December 2009 gang-related shooting, would have inferred that Lopez was never convicted for the prior shooting and "would therefore have been motivated to punish [him] for both offenses by convict[ing] in the current case." However, absent evidence to the contrary, we will presume the jury followed the court's instruction on the limited use of the gang evidence. (See *People v. Talhelm* (2000) 85 Cal.App.4th 400, 409.) For all of these reasons, we reject Lopez's claim of ineffective assistance of counsel based on defense counsel's failure to object to Darington's testimony about the December 2009 vehicle stop.

### C. *Failing to object to testimony on propensity for violence*

In describing one of the gang-related documents found in Lopez's possession, Darington testified: "To me it's identifying who he is …. It uses the derogatory term 'scraps,' which shows in my opinion he's a Northerner speaking derogator[il]y of Southern gang members; again identifying himself as Panda Locs and that he has a propensity [for] violence towards these people." Later in direct examination, the following questioning occurred:

> "[Prosecutor]. So how do you size it up, then, and how is it that a teenager has writings in his possession that's articulating the murder of other individuals, including shooting them in the head just for being a member of another group?

> "A. Again, through my training and experience and through my opinion, I believe that he's associating with gang members from the Earlimart area that have the same mentality and the same belief system as you've seen [in the written documents offered as evidence]. So I believe that he's showing and demonstrating that he wants to live that type of life through the gang.

"[Prosecutor].  So he's demonstrating … through his writing and his behavior that there's almost a comfort with the idea of violence.  Is that a fair statement?

"A.  I believe so.

"[Prosecutor].  And now, through what we discussed and through a lot of these incidents and the fact that he's hanging out with these Northerners and the fact you describe a lot of the activities that he's in, is there an indoctrination where violence, which is absurd to the rest of us, which is not normal to the rest of us, is there an indoctrination that is making him okay with the idea of violence, especially … against rival gang members?

"A.  Again, in my opinion, when you become a gang member you're not looking to be a productive member of society.  You're electing to be part of a group that is based on fear, intimidation, not only towards the rival gang members, but toward the community.  So the violence is almost second nature because you're not going to gain the respect and the fear and intimidation of not only the rivals, but in the community if you don't do it through violence or threats of violence."

Lopez recognizes that an expert is permitted to testify on her opinion "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801) and that "the culture and habits of criminal street gangs … meets this criterion" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617).  He argues, however, that the testimony quoted above went beyond permissible gang expert testimony under the limitations set forth in *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved of on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048, footnote 3 (*Vang*), and *Vang*.  Therefore, Lopez contends, defense counsel's failure to object to this testimony constituted ineffective assistance of counsel.  To assess Lopez's contention, we begin with an examination of *Killebrew* and *Vang*.

In *Killebrew*, this court held that a gang expert may not testify about the subjective knowledge and intent of a defendant with respect to the crime charged.  (*Killebrew*, *supra*, 103 Cal.App.4th at p. 647.)  *Killebrew* involved a charge of conspiracy to possess

21.

a handgun. The prosecution theorized that several young Black men observed traveling in three cars in East Side Crip territory late at night were all members of the East Side Crips and had conspired to possess two handguns. One of the handguns was found in one of the three cars seen traveling together. The other handgun was discovered hidden near a taco stand where the other two cars and seven suspects were found. (*Id*. at p. 648.) The defendant, Killebrew, was not found in the car with the gun or with the seven suspects at the taco stand, but the prosecution theorized that he had been in one of the three cars earlier that night and he also participated in the conspiracy. (*Id*. at pp. 648–649.)

At Killebrew's trial, a gang expert testified at length about local gangs and gang psychology. He testified that, at the time of the alleged conspiracy, the East Side Crips would have been expecting retaliation from a rival gang because of a recent gang-related shooting. The expert also opined that Killebrew and the other suspects were all members of the East Side Crips. Killebrew did not challenge this testimony on appeal. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 652.) He took issue, however, with the expert's opinions that everyone in the group that night would know there was a gun in the car and would mutually possess the gun and that even occupants of the car to which no gun was ever linked would know of the guns in the other two vehicles and would mutually possess those guns. (*Ibid*., fn. 7.) Killebrew argued that these opinions on the subjective knowledge and intent of each occupant of the cars were impermissible. (*Ibid*.)

This court agreed. Surveying cases on gang expert testimony, we observed that testimony on the "'culture and habits'" of criminal street gangs generally covers the composition or existence of a gang, gang territory, gang colors, graffiti, tattoos and hand gestures, rivalries between gangs, an individual's membership in or association with a gang, the primary activities of a gang, the motivation for particular crimes (such as retaliation or intimidation), and whether and how a crime was committed to benefit or promote a gang. (*Killebrew*, *supra*, 103 Cal.App.4th at pp. 656–657.) The gang expert in

*Killebrew*, however, went much further as he "testified to the subjective *knowledge and intent* of each occupant in each vehicle." (*Id*. at p. 658.)

The court concluded:

"[The gang expert's] testimony was the only evidence offered by the People to establish the elements of the crime. As such, it is the type of opinion that did nothing more than inform the jury how [the expert] believed the case should be decided. It was an improper opinion on the ultimate issue and should have been excluded." (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.)

The holding of *Killebrew* was limited. In reaching our conclusion, we noted that all of the following expert testimony would be admissible: that a gang would expect retaliation as a result of a prior shooting; that gangs would travel in large groups if expecting trouble; that in a confrontation, more than one gang member may share a gun in some circumstances; and that oftentimes gang members traveling together may know if one of their group is armed. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.)

In *Vang*, the California Supreme Court held it was permissible for a gang expert to give his opinion that an assault committed in the manner described in a hypothetical question would be gang related. (*Vang*, *supra*, 52 Cal.4th at p. 1049.) Considering the significance of our decision in *Killebrew*, the high court explained:

"To the extent that *Killebrew*, *supra*, 103 Cal.App.4th 644, was correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason, the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion

on the issue of guilt."'" [Citations.]" (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. omitted.)

Returning to the current case, we conclude that Darington's testimony did not violate the rules on gang expert testimony expressed in *Killebrew* and *Vang*. She did not testify about Lopez's subjective knowledge or intent at the time of the shooting. She did not, for example, opine that Lopez intended to kill Christian and Juan or that Lopez shot at Christian's car because he knew the occupants were rival Southern gang members and he wanted to intimidate Southerners and the community at large. Rather, she properly gave her opinion as to a hypothetical question based on the evidence presented in the case. (See *Vang*, *supra*, 52 Cal.4th at p. 1046.) The challenged testimony quoted above was relevant to Lopez's knowledge of gang life—including the violent rivalry between Northerners and Southerners—and his acceptance of gang culture. Thus, it was the type of permissible "'culture and habits'" testimony we described in *Killebrew*, *supra*, 103 Cal.App.4th at pages 656–657.

In light of the foregoing, defense counsel was not deficient for not raising an objection to Darington's testimony based on *Killebrew* and *Vang*. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel."].)

Lopez's ineffective-assistance-of-counsel claim is based on *Killebrew* and *Vang*. He does not claim Darington's testimony was improper character evidence nor does he cite Evidence Code section 1101[8] in his appellate briefs. Nonetheless, to the extent

---

**8** Evidence Code section 1101, subdivision (a) provides generally that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and

24.

Lopez may be arguing that defense counsel should have objected to Darington's testimony as improper character evidence, this argument fails. Defense counsel made the tactical decision to present character evidence by eliciting testimony from Lopez's mother that she had never known Lopez to have a propensity for violence. Given this tactical decision, defense counsel could not object to Darington's testimony on the ground that it was improper character evidence. (See Evid. Code, § 1102 [character evidence is admissible if offered by the defendant to prove his conduct conforms to the character and when offered by the prosecution to rebut such defense evidence].) The tactical decision to present character evidence of Lopez's lack of propensity for violence is not outside the wide range of competent representation. As a result, we reject any claim of ineffective assistance of counsel based on counsel's failure to raise a character-evidence objection to the prosecution's evidence.

## III. *Sentencing errors*

Lopez was convicted of two counts of assault with a firearm in violation of section 245, subdivision (a)(2). For each of these counts (counts 4 and 5), the trial court imposed a middle term of three years, plus an enhancement of 20 years pursuant to section 12022.53, subdivision (c), plus an enhancement of 10 years pursuant to section 186.22, subdivision (b)(1)(C). The parties agree that these enhancements are not authorized under the law.

### A. *Firearm enhancement*

Section 12022.53, subdivision (c), provides for an additional term of 20 years for a person who personally and intentionally discharges a firearm in the commission of a felony specified in subdivision (a). However, assault with a firearm in violation of section 245, subdivision (a)(2), is not among the felonies listed in subdivision (a) of

---

in good faith believe that the victim consented) other than his or her disposition to commit such an act." (*Id*., subd. (b).)

section 12022.53. Accordingly, the 20-year enhancements for counts 4 and 5 are unauthorized, and we order them stricken. (See *People v. Smith* (2012) 24 Cal.4th 849, 854 [appellate court may correct unauthorized sentence without remand].)

### B. Gang enhancement

Under section 186.22, subdivision (b)(1), a person convicted of committing a gang-related felony is subject to an additional five-year term if the felony is a "serious felony" as defined in subdivision (c) of section 1192.7 or an additional 10-year term if the felony is a "violent felony" as defined in subdivision (c) of section 667.5 (§ 186.22, subd. (b)(1)(B) & (C).) Assault with a firearm in violation of section 245, subdivision (a)(2), is not a "violent felony" under section 667.5. It is a "serious felony," however. (§ 1192.7, subd. (c)(31).) Therefore, the correct enhancements for counts 4 and 5 pursuant to section 186.22, subdivision (b)(1)(B), are additional five-year terms. We order the unauthorized 10-year terms for counts 4 and 5 stricken and replaced with five-year terms.

### DISPOSITION

The 20-year enhancements imposed by the trial court under section 12022.53, subdivision (c), for counts 4 and 5 are stricken. In addition, the 10-year enhancements imposed by the trial court under section 186.22, subdivision (b)(1)(C), for counts 4 and 5 are stricken and replaced with five-year enhancements pursuant to section 186.22, subdivision (b)(1)(B). The trial court shall prepare an amended abstract of judgment and forward a copy to the appropriate correctional authorities. The judgment is affirmed in all other respects.

_____
Kane, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Poochigian, J.

26.